**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────

**JSC FOREIGN ECONOMIC ASSOCIATION**
**TECHNOSTROYEXPORT,**

                **Plaintiff,**

       **- against -**

**ABRAHAM WEISS and WEISS & CO.,**

                **Defendants.**
────────────────────────────────────

            **06 Civ. 6095 (JGK)**

            <u>**OPINION AND ORDER**</u>

**JOHN G. KOELTL, District Judge:**

    The plaintiff, JSC Foreign Economic Association Technostroyexport ("Techno"), is a Russian Open Joint Stock Corporation that has been involved in litigation for over ten years to obtain and enforce a judgment for more than $200 million against the former New York corporation International Development and Trade Services, Inc. ("IDTS") and its alter egos Edith Reich and Brigitte R. Jossem. The judgment, which confirmed two international arbitration awards and was entered in 1997, arose from a series of contracts Techno entered into in the early 1990s to supply Russian bulk metals to IDTS. IDTS received the metals and resold them through its sales agent Newco AG ("Newco"), a Swiss corporation, but IDTS failed to pay approximately $200 million that it owed Techno pursuant to these contracts. In a separate 2003 action, this Court granted summary judgment to Techno on its claim that Reich and Jossem

diverted millions of dollars from IDTS for their personal use and found that Reich and Jossem were themselves liable for the full amount of the judgment.  JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461, 471-76 (S.D.N.Y. 2005).  That decision contains an extensive discussion of the facts pertaining to Reich and Jossem's diversion of IDTS funds which need not be repeated here.[1]

Techno brings this civil action against a certified public accountant, Abraham Weiss, and his accounting firm, Weiss & Co., who Techno alleges were members along with Reich, Jossem, and others in a criminal enterprise whose aim was to hide, conceal, and launder the money that Reich and Jossem stole from Techno in the early 1990s, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Techno asserts two claims against Weiss and Weiss & Co.:  (1) violation of the substantive RICO statute 18 U.S.C. § 1962(c),

---

[1]  The history of Techno's efforts to enforce its judgment against IDTS, Reich, and Jossem is further detailed in the decision of the Court of Appeals for the Second Circuit affirming the judgment entered against IDTS, AOOT Foreign Econ. Assoc. (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 139 F.3d 980 (2d Cir. 1998), and in other decisions of this Court denying a motion to dismiss a complaint alleging corporate veil-piercing against Reich and Jossem, JSC, 295 F. Supp. 2d 366 (S.D.N.Y. 2003), and holding Reich and Jossem in civil contempt for violating orders of attachment in connection with that complaint, JSC, 03 Civ. 5562, 2006 WL 1206372 (S.D.N.Y. May 1, 2006) (Reich); JSC, 03 Civ. 5562, 2006 WL 1148110 (S.D.N.Y. Apr. 28, 2006) (Jossem).  Techno is also litigating in the New York State Supreme Court to enforce the judgments against additional alter egos of Reich and Jossem.  (Compl. ¶ 11.)  To date, Techno has collected only $7 million of the funds it is owed.  (Id. ¶ 10.)

and (2) conspiracy to violate the RICO statute in violation of 18 U.S.C. § 1962(d).  Jurisdiction is proper pursuant to 18 U.S.C. § 1964.

The defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  In connection with that motion, the defendants submitted an affidavit attaching as exhibits fifty-seven documents which the defendants contend Techno had received by late 1998 when it deposed Weiss during its earlier attempts to enforce the judgment entered against IDTS.  (Aff. of Sheldon H. Elsen, Oct. 23, 2006.)  The defendants argue that Techno relied on these documents in bringing this action and thus that the documents should be considered to determine whether this action is untimely under the four-year statute of limitations for civil RICO actions. Techno has moved to strike this affidavit and the attached exhibits, as well as factual assertions the defendants made in reference to those exhibits.

For the reasons stated below, the motion to dismiss is **denied** and the motion to strike is **denied as moot**.

**I.**

**A.**

For the purpose of deciding this motion to dismiss, the following facts alleged in the Complaint are accepted as true.

Between 1991 and 1993, pursuant to contracts, Techno shipped metals to IDTS with a total value of over $400 million. Reich and Jossem caused IDTS to fail to pay Techo approximately $175 million of the amount owed, and they converted these proceeds to their personal use.  (Compl. ¶¶ 49-50.)

Reich and Jossem were introduced to Weiss in late 1992 and retained him and his accounting firm Weiss & Co. in January 1993.  (Id. ¶ 51.)  Weiss learned about the IDTS contracts and knew that IDTS failed to remit the proceeds of its metal sales to Techno.  Weiss represented IDTS in negotiations with Techno and Newco concerning the IDTS metals contracts.  Weiss made several trips to Switzerland to meet with representatives of Newco.  (Id.)

In maintaining IDTS's books, Weiss and Weiss & Co. failed to account for its revenue and expenditures or record its income accurately.  Weiss & Co. prepared false tax returns for IDTS that concealed its revenues and income and exaggerated its expenses.  (Id. ¶ 52.)  Weiss directed the preparation of these tax returns with knowledge that Reich and Jossem would file them with the IRS without changes.  (Id.)

In a letter dated December 9, 1993, Weiss wrote that IDTS sold the metals it received from Techno through its agent for $389 million.  Newco retained some commission and expenses, but it transferred at least $303 million to IDTS.  (Id. ¶ 53.) However, IDTS's tax returns for the years 1992-94 when these payments were received show "gross receipts" totaling less than $5.5 million.  The majority of IDTS's proceeds from metal sales were never entered on its books or reported on its corporate tax returns.  (Id. ¶¶ 54-55.)

With Weiss's knowledge, Reich and Jossem concealed millions of dollars that they stole through IDTS in an IDTS bank account at the United Mizrahi Bank in Switzerland.  (Id. ¶ 56.)  At the request of Reich and Jossem, Weiss reclassified IDTS revenue as loans to Reich and Jossem to conceal these proceeds further. Weiss and Weiss & Co. referred to the loans as "Swiss loans." (Id. ¶ 57.)  Weiss knew that the "Swiss loan" funds were revenues of metal sales that should have been remitted to Techno, and he knew that reclassifying them as loans was a means for transferring the funds from Switzerland to Reich and Jossem's accounts in the United States and of avoiding any income tax payments.  Weiss further knew that Reich and Jossem used some of the "Swiss loan" funds to purchase and renovate four apartments on East 72nd Street in Manhattan, which they have used as their residence since 1994.  (Id. ¶¶ 57-58, 68.)

Techno alleges on information and belief that at the time when Weiss & Co. prepared tax returns for Reich and Jossem, Weiss knew that Reich had been convicted of wire fraud in connection with a scheme to generate fraudulent orders for auto parts manufactured by Dayco Corp.  (Id. ¶¶ 60-61.)  Reich filed for personal bankruptcy in September 1984, and the bankruptcy was discharged on February 18, 1995.  Weiss knew that Reich was in bankruptcy proceedings.  During those proceedings, Weiss knew that Reich received millions of dollars, including at least $14.8 million transferred by Newco to her personal account in Switzerland, yet the 1992 tax return Weiss & Co. prepared for Reich did not reflect this income.  (Id. ¶¶ 62-65.)  Because Reich never disclosed these payments to the bankruptcy court or that she had received millions of additional dollars that she stole from IDTS, Techno alleges that the funds were proceeds of bankruptcy fraud.  Techno alleges that Weiss and Weiss & Co. knew that these funds were not only stolen through IDTS, but also represented proceeds from bankruptcy fraud.  (Id. ¶¶ 65-67.)

Weiss caused M & B Oxford 41, Inc. ("M & B") to be incorporated in 1993 knowing that's its sole purpose was to hold title to the 72nd Street properties of Reich and Jossem.  At first Jossem was the sole shareholder of M & B, until she conveyed all of her stock through a chain of companies that are

6

all alter egos of Reich and Jossem.  When Techno intensified its
efforts to recover its stolen money in 1997, Weiss together with
an Israeli attorney Michael Shine devised a stock purchase
agreement to transfer shares of the alter ego company holding
the 72nd Street properties to another alter ego of Reich and
Jossem in exchange for the repayment of various fictitious
loans.  (Id. ¶¶ 69-70.)

Weiss also devised a scheme to create dummy corporations
with no business activities that paid "consulting fees" to
Jossem as a way to launder the money stolen through IDTS.  Weiss
formed Mabro Trading International, Ltd. ("Mabro") in 1993, and
Weiss caused Weiss & Co. to prepare fraudulent federal and state
tax returns for Mabro which showed millions of dollars in "gross
receipts or sales" but offset this income with fraudulent
deductions for rent payments associated with the 72nd Street
properties and for Jossem's personal expenses.  Jossem received
over $1 million in "consulting fees" from Mabro, but these fees
were actually transfers of stolen fees from IDTS back to Jossem.
(Id. ¶¶ 71-76.)

Techno alleges, on information and belief, that Mabro filed
its last federal tax return in 1998.  Techno further alleges
that around this time Weiss and Shine created the company
Hasnaco Trading Ltd. ("Hasnaco") under the laws of Cyprus to
replace Mabro and to simplify tax preparation work because

Hasnaco was a foreign company and thus not required to file United States tax returns.  (Id. ¶ 77.)  Jossem received over $6 million in payments from Hasnaco between 1999 and 2001, which her tax returns describe as consulting income.  (Id. ¶¶ 78-80.) Weiss knew that the payments were not compensation for consulting services or any legitimate business, but rather were transfers of the funds stolen by Reich and Jossem.  (Id.)  Weiss caused Weiss & Co. to deduct rent as a business expense on Jossem's tax returns, knowing that Jossem never paid rent to another entity and did not use her residence in the 72nd Street properties for business purposes.  (Id. ¶ 81.)

Weiss also devised a means for Reich and Jossem to take part in a variety of real estate developments in the Hamptons using the proceeds they had stolen through IDTS.  In 1997, Reich, Jossem, and Weiss began purchasing property for future development in the name of Atrium Square, Inc., which was an alter ego of Reich and Jossem.  (Id. ¶¶ 24, 83.)  Weiss then advocated the approach of using a series of single-purpose entities, rather than Atrium Square alone, to conduct real estate transactions to avoid adverse tax consequences and to make it more difficult to trace the source of the money used to purchase the real estate projects.  (Id. ¶¶ 83-84.)  Techno alleges on information and belief that funds were funneled through Hasnaco to finance the real estate projects of these

8

entities.  Weiss directed Jossem to open an account with
Sterling Bank and controlled payments that flowed through this
account via wire transfer, with the advice and consent of Reich
and Jossem.  (Id. ¶ 86.)

Techno's Complaint includes detailed allegations of various
real estate transactions involving Reich and Jossem in which
Weiss and Weiss & Co. participated and from which Weiss directly
profited.  In summary, these allegations include a series of
transactions between various single-purpose entities controlled
by Reich and Jossem involving the purchase, development, and
sale during the period from 1998 to 2003 of properties in the
Hamptons.  (Id. ¶¶ 87-103.)  Techno alleges that Weiss or Weiss
& Co. received significant payments in connection with many of
these transactions.  (Id. ¶¶ 87, 90, 93, 99, 102.)  Weiss is
alleged to have directed the transfer of funds between the
accounts of various entities in connection with these sales.
(See id. ¶¶ 96, 99, 102.)

After Techno filed its federal action in 2003 to enforce
its original IDTS judgment against Reich and Jossem, several
additional properties on Red Dirt Road in Amagansett were sold
with Weiss's knowledge and participation with the proceeds
distributed to alter egos of Reich and Jossem and to third
parties allegedly holding mortgage liens on other Reich and
Jossem properties.  (Id. ¶¶ 104-05.)

9

Two additional properties that were purchased using Reich
and Jossem's stolen funds are still held by the entities
Lopers/Noyack Path, L.L.C. and Roses Grove, L.L.C., both which
Techno alleges to be alter egos of Reich and Jossem. (Id. ¶¶
34-35, 106.)  Lopers/Noyack is currently a debtor in a
bankruptcy case filed by Weiss in the United States Bankruptcy
Court for this district.  Weiss claims to be both an equity
participant and a creditor of Lopers/Noyack. (Id. ¶ 35, 107.)
Both properties are burdened by substantial mortgages. (Id. ¶
106.)  Lopers/Noyack purchased its property on February 18,
2000, while Roses Grove acquired its property on January 26,
2000. (Id. ¶¶ 107-08.)  Roses Grove was at the time of filing
the Complaint subject to at least three foreclosure actions,
including one by mortgagee Dothlyn Investments Limited. (Id. ¶¶
40, 108.)  Techno is seeking to invalidate the Dothlyn mortgage
as a fraudulent conveyance in its state court action. (Id. ¶
108.)

The Complaint includes allegations that Reich and Jossem
used the auction houses Christie's and Sotheby's to launder
funds, but those allegations do not address the defendants' role
directly and are not addressed further. (See id. 42, 109-18.)

In sum, Techno alleges that Weiss and Weiss & Co., together
with Reich, Jossem, Shine, and other participants, participated
in the conduct of the affairs of a criminal enterprise within

the meaning of the RICO statute, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Techno alleges that the defendants engaged in a pattern of racketeering activity including the predicate acts detailed above, which it alleges constituted money laundering in violation of 18 U.S.C. § 1956, monetary transactions greater than $10,000 in property derived from specific unlawful activity in violation of 18 U.S.C. § 1957, transportation of stolen property in violation of 18 U.S.C. § 2314, and the sale and receipt of stolen property in violation of 18 U.S.C. § 2315. (Id. ¶¶ 121-23.)

### B.

On a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the Complaint are accepted as true.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor.  Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  Therefore, the defendants' present motion should

only be granted if it appears that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief.  See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 514 (2002) (citing Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984)); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Grandon, 147 F.3d at 188; Goldman, 754 F.2d at 1065.

While the Court should construe the factual allegations in the light most favorable to the plaintiff, the Court is not required to accept legal conclusions asserted in the Complaint. See Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002); Barile v. City of Hartford, 386 F. Supp. 2d 53, 54 (D. Conn. 2005).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the Complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.

1991); VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001).

## II.

### A.

The defendants first contend that this action is untimely because Techno was on notice of the alleged claims at the time it deposed Weiss in 1998 during Techno's original efforts to enforce its judgment against IDTS and because any injury had already occurred at that point.  The limitations period for civil RICO actions is four years.  Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987).  "The limitations period begins to run when the plaintiff discovers or should have discovered the RICO injury."  In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998) (citing Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir. 1988)).[2]  At that point, the statute of limitations is triggered only as to those defendants about whom the plaintiffs were on notice.  Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F. Supp. 435, 445 (E.D.N.Y. 1997); Butala v. Agashiwala, 95 Civ. 936, 1997 WL 79845, at *5 (S.D.N.Y. Feb. 24, 1997).  Under the "separate accrual rule" applied in this

---

[2]  The Supreme Court has explained that a cognizable injury under the RICO statute comprises damages that "flow from the commission of the predicate acts," and that no heightened requirement of proving a "racketeering injury" applies.  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497 (1985).

circuit, "a new claim accrues and the four-year limitations period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." In re Merrill Lynch, 154 F.3d at 59 (citing Bankers Trust, 859 F.2d at 1103); see also Bingham v. Zolt, 66 F.3d 553, 559-60 (2d Cir. 1995) ("A necessary corollary of the separate accrual rule is that plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought.").[3]

Because this action was filed on August 10, 2006, the plaintiff cannot recover for any injuries that it discovered or reasonably should have discovered before August 10, 2002.  The defendants characterize the injury alleged in the Complaint as Techno's inability to enforce its 1997 judgment against IDTS because of the concealment and laundering of the funds Reich and Jossem had diverted.  In their initial motion papers, the defendants asserted that Techno had notice of this injury even before it deposed Weiss in 1998 in connection with its efforts to enforce the 1997 judgment, basing their argument upon a series of documents they asserted had been produced to Techno in

---

[3]  The Supreme Court twice has narrowed a division among the circuits over the rule defining when a civil RICO cause of action accrues, first eliminating the Third Circuit's last predicate act rule, Klehr v. A.O. Smith Corp., 521 U.S. 179, 187 (1997), and then eliminating the rules favored in several circuits requiring notice of a pattern of RICO activity in addition to notice of an injury, Rotella v. Wood, 528 U.S. 549, 554-558 (2000). Neither decision purported to settle upon a single acceptable rule, however, and neither overruled the separate accrual rule established by the Second Circuit Court of Appeals in Bankers Trust.  See Rotella, 528 U.S. at 553, 554 n.2; Klehr, 521 U.S. at 190-92.

advance of that deposition.[4]  The documents, attached as exhibits

to the Affidavit of Sheldon H. Elsen dated October 23, 2006,

include a transcript from Weiss's deposition, correspondence

between Weiss and Newco, tax returns for IDTS, Reich and Jossem,

IDTS financial account and transaction records, bank account

records, and internal memos from Weiss & Co.  (See generally

Exs. attached to Elsen Aff., Oct. 23, 2006.)  The defendants

argued that the documents sufficed to put Techno on notice of

any RICO injury alleged to be caused by Weiss or Weiss & Co. and

that the Court can consider the documents under Cortec

Industries, Inc. v. Sum Holding L.P. because Techno relied on

the documents in bringing its Complaint.  See Cortec Indus., 949

F.2d at 48 ("Where plaintiff has actual notice of all the

information in the movant's papers and has relied upon these

documents in framing the complaint the necessity of translating

a Rule 12(b)(6) motion into one under Rule 56 is largely

dissipated.").

Techno has moved to strike the documents submitted with the

Elsen Affidavit and has submitted its own declaration by counsel

denying that Techno possessed most of the documents submitted

---

[4]  The defendants' inference that Techno possessed the documents at the time of the Weiss deposition in 1998 apparently arose from a series of consecutive "Bates numbers" on the whole range of documents and the fact that certain of those documents had been marked as exhibits during Weiss's deposition.  (See Decl. of Ira M. Feinberg ¶ 7; Def. Mem. of Law in Opp'n to Techno's Mot. to Strike at 1 & n.1.)

with the Elsen Affidavit in 1998 (although it did possess the few documents marked as exhibits for Weiss's 1998 deposition). (See Feinberg Decl. ¶¶ 2-7.)  While the defendants attempt in their legal memoranda to link various of the submitted documents to particular portions of the Complaint to prove that Techno "relied upon" the documents, this argument is at best inferential and it is contrary to Techno's representations. Furthermore, the quantity and type of documents the defendants have submitted are not consistent with the limited circumstances in which courts consider materials beyond the Complaint on a Rule 12(b)(6) motion.  In Chambers v. Time Warner, Inc., which followed Cortec Industries, the Court of Appeals for the Second Circuit clarified that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Chambers, 282 F.3d at 153.  "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls . . . ." Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).  The documents at issue here are not of a contractual nature, but rather consist primarily of correspondence and

financial records gleaned through Techno's discovery efforts, and hence they are not properly considered at this stage.[5]

Moreover, the purpose for which the defendants offer these documents—to show that this RICO action is time-barred—depends not on whether Techno relied on the documents in bringing its Complaint, but rather on when Techno had notice of the information contained in the documents.  Apart from the tax returns and several other documents that Techno admits it possessed in 1998 (Exs. 2, 3, 11-16, 19, 20 to Elsen Aff.; see Feinberg Decl. ¶¶ 3-4), the defendants have not established through reference to the Complaint that Techno had actual notice of the remaining documents more than four years before this action was filed.[6]  To the extent that the defendants have not shown notice of the remaining documents at a time early enough to bar to this action, consideration of those documents would be unavailing for this purpose.

Acknowledging this gap, during briefing on the current motions the defendants submitted a second affidavit supporting

---

[5]  Neither party prefers to convert this motion to dismiss into a motion for summary judgment pursuant to Rule 56 as provided for in Rule 12(b), and the Court declines to do so.  Conversion would require that all parties be given the opportunity to present all material pertinent to a summary judgment motion and there may well be issues as to whether such a motion is appropriate before any discovery is conducted in this case.  However, this does not foreclose the possibility of a motion for summary judgment at an appropriate time.

[6]  Techno in fact represents that IDTS produced the remainder of the documents at issue to it in January 2004.  (See Feinberg Decl. ¶ 5.)

their new assertion that the Court ordered that all of the IDTS documents at issue be produced to Techno's prior counsel on October 21, 1999 and that counsel for IDTS, Reich, and Jossem made it clear in a conference before the magistrate judge on November 22, 1999 that they were prepared to produce the documents.  (<u>See</u> Exs. A & B to Second Aff. of Sheldon H. Elsen, Dec. 21, 2006.)  The defendants contend that because Techno, through its prior counsel, abandoned its litigation efforts at that time and did not pick up documents that were available, Techno had "inquiry notice" of Weiss's alleged involvement in the enterprise by 1999.

But this "inquiry notice" argument was raised only in the defendants' reply brief on their motion to dismiss and thus should not be considered here because Techno has had inadequate opportunity to respond to this theory.  <u>See</u> <u>Knipe v. Skinner</u>, 999 F.2d 708, 711 (2d Cir. 1993) (collecting cases); <u>Evans v. City of New York</u>, 308 F. Supp. 2d 316, 328 n.7 (S.D.N.Y. 2004). Furthermore, while courts have occasionally found inquiry notice as a matter of law, particularly in the context of investment schemes whose fraudulent nature is apparent from prospectuses or offering materials that properly may be considered on a motion to dismiss, <u>see, e.g.</u>, <u>In re Merrill Lynch</u>, 154 F.3d at 60, this does not appear to be one of the "rare cases" where inquiry notice can be determined without more factual development,

particularly based on documents that the plaintiff may not have
had.  Fischer v. Reich, 92 Civ. 4158, 1995 WL 23966, at *4
(S.D.N.Y. 1995) (discussing fraud-based RICO claim); accord
Butala v. Agashiwala, 916 F. Supp. 314, 318 (S.D.N.Y. 1996)
("Where the undisputed facts set forth in the complaint
establish inquiry notice and lack of due diligence, resolution
of the issue on a motion to dismiss is appropriate." (emphasis
added) (internal quotation marks omitted)).

The parties disagree over whether the fact that Weiss
invoked his Fifth Amendment privilege against self-incrimination
in his 1998 deposition supports the defendants' argument of
inquiry notice.  Weiss was deposed again in 2003, at which time
he did not invoke the Fifth Amendment and testified about his
participation in the alleged RICO enterprise.  (See Compl. ¶¶ 6,
8.)  Techno contends that Weiss's invocation of the privilege
thwarted its reasonable efforts to investigate the RICO scheme
and prevented it from reasonably discovering his involvement in
1999, the date when the defendants have sought to establish
inquiry notice.  Cf. McIntyre v. United States, 367 F.3d 38, 55-
56 (1st Cir. 2004) (finding that use of the Fifth Amendment
privilege would have prevented reasonably diligent inquiry from
revealing FBI's potential tort liability for an informant's
murder).  The defendants argue that Weiss's invocation of his
Fifth Amendment privilege should have placed Techno on inquiry

19

notice of its claims against him.  In any event, the defendants do not appear to argue that Weiss's 1998 deposition standing alone put Techno on sufficient notice, and thus the impact of Weiss's invocation of the privilege is simply another factual dispute, the significance of which cannot be decided on a motion to dismiss.

Finally, Techno argues that neither the 1998 Weiss deposition nor any documents it received or could have received by 1999 could possibly have put it on notice of subsequent "separate and independent injuries" that accrued after 1998 under the separate accrual rule.  See Bingham, 66 F.3d at 560. For example, the Complaint includes allegations about Weiss's helping to launder money by paying Jossem "consulting fees" through the entity Hasnaco and about his involvement with various real estate transactions in the Hamptons, all between 1998 and 2003.  The defendants contend that Techno suffered only one RICO injury, namely the diversion of funds from its debtor IDTS, and that any subsequent predicate acts did not result in separate injuries.  In the Bingham case, which involved the diversion of assets and royalties from the estate of reggae musician Bob Marley after his death, the court found that the separate accrual rule applied because "each illegal diversion constituted a new and independent legally cognizable injury to the estate."  Id. at 561.  Techno's case differs in that many of

the alleged predicate acts involved serial laundering and concealing of funds that were initially diverted from IDTS, rather than the diversion of separate sums of royalties or assets.  Nonetheless, Techo's allegations that predicate acts subsequent to the initial diversion of funds from IDTS caused it injury raise the possibility that separate injuries were incurred, and the defendants have not at this stage established as a matter of law that this theory of separate injuries is incorrect.  Therefore, the Court could not dismiss the Complaint on the grounds that all of the injuries occurred prior to four years before the date the Complaint was filed and were discovered or should have been discovered at that time.[7]

### B.

The defendants next argue that the Complaint does not adequately allege that they "conduct[ed] or participate[d]" in the conduct of the RICO enterprise's affairs within the meaning of 18 U.S.C. § 1962(c).  See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) ("[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . but some part in directing that enterprise's affairs is required.").  This element of a

---

[7]  The separate accrual rule does not revive time-barred claims but only allows suit for new and independent injuries within the statute of limitations.  See Bingham, 66 F.3d at 559-60.

§ 1962(c) RICO claim is often referred to as the "operation or management" requirement.  See Reves, 507 U.S. at 185.

The defendants assert that Reves and subsequent cases applying its holding show that those who provide outside professional services to a criminal enterprise, such as lawyers and accountants, do not "operate or manage" the enterprise, even where those professionals knowingly conceal the enterprise's crimes.  See, e.g., Madanes v. Madanes, 981 F. Supp. 241, 256-57 (S.D.N.Y. 1997); Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 465-69 (S.D.N.Y. 1996); Biofeedtrac Inc. v. Kolinor Optical Enters. & Consultants, S.R.L., 832 F. Supp. 585, 590-92 (E.D.N.Y. 1993).  However, Reves provides no blanket immunity for professionals regardless of their involvement in a criminal enterprise, and other cases suggest that, where professionals are alleged to have exceeded the mere rendering of legitimate professional services, the "operation or management" requirement will be pleaded adequately.  E.g., Cadle Co. v. Flanagan, 01 Civ. 531, 2006 WL 860063, at *9 (D. Conn. Mar. 31, 2006) (law firm's conduct "far exceeded the rendering of legal advice and constituted participation in fraudulent conduct in violation of RICO"); Tribune Co. v. Purcigliotti, 869 F. Supp. 1076, 1098 (S.D.N.Y. 1994) (participation requirement met where law firm helped devise and manage a fraudulent scheme), aff'd sub nom. on other grounds, Tribune Co. v. Abiola, 66 F.3d 12 (2d

Cir. 1995).  Moreover, many of the cases the defendants rely

upon were decided on summary judgment, not as here on a Rule

12(b)(6) motion.

The Complaint alleges that Weiss and Weiss & Co. did more

than prepare tax returns or provide outside accounting services.

In particular, it alleges that Weiss was an "architect" of some

of the money laundering activities, that he devised and managed

the scheme to use a chain of single-use entities to carry out

real estate transactions, that he received more than $2 million

in profits from the real estate transactions (exceeding a

reasonable fee for mere outside professional services), and that

he was an equity investor in at least one of the real estate

projects.  These allegations are sufficient at the pleading

stage to satisfy Techno's burden to allege that the defendants'

conduct meets the "operation or management" requirement of

Reves.

### C.

The defendants also argue that Techno has not sufficiently

alleged a RICO "enterprise" as an element distinct from a

"pattern of racketeering activity."  See United States v.

Turkette, 452 U.S. 576, 583 (1981) ("The existence of an

enterprise at all times remains a separate element which must be

proved . . . .")  Where as here there is no formal legal entity

comprising the enterprise, the plaintiffs must plead the existence of a "union or group of individuals associated in fact."  See 18 U.S.C. § 1961(4); Turkette, 452 U.S. at 581-82.

The defendants rely on a recent decision by the Court of Appeals for the Second Circuit, First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004), to argue that the plaintiff must allege a "course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves."  Id. at 174.  If this were correct, the decision would appear to conflict with United States v. Mazzei, 700 F.2d 85 (2d Cir. 1983), in which the Court of Appeals held that proof of the separate elements of a RICO "enterprise" and a "pattern of racketeering activity" need not be "distinct and independent, as long as the proof offered is sufficient to satisfy both elements."  Id. at 89; accord United States v. Coonan, 938 F.2d 1553, 1559-60 (2d Cir. 1991) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.'  Thus, we have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." (internal citations omitted)); United States v. Bagaric, 706 F.2d 42, 55 (2d Cir. 1983) ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than

24

the sum of the predicate racketeering acts."), abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259-60 (1994).

While Satinwood appears to impose a more stringent standard for pleading the existence of an enterprise, requiring facts beyond the predicate acts themselves, the validity of the enterprise pleading requirement was in fact not squarely before the Satinwood court because none of the three district court decisions on appeal in that case had dismissed the RICO claim on the grounds that the plaintiff failed to allege a RICO enterprise.  See World Wrestling Entertainment v. Jakks Pac., Inc., 425 F. Supp. 2d 484, 500 (S.D.N.Y. 2006) (finding that Satinwood did not implicitly overrule Mazzei).  The district court had however dismissed the complaint in part for a failure to allege sufficiently a "pattern of racketeering activity," see First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 219 F. Supp. 2d 576, 583-87 (S.D.N.Y. 2002), and the Satinwood court affirmed the district court's judgment on that basis. Satinwood, 385 F.3d at 164.  It is unclear why the Court of Appeals went on to discuss in dicta the adequacy of the complaint with respect to the RICO "enterprise" element when that issue was not raised on appeal and not briefed by the parties.  See Jakks Pac., 425 F. Supp. at 500.  Neither the parties nor the Court of Appeals cited Mazzei, and the Satinwood

decision in fact included citations to a line of cases from the Eighth Circuit that had been explicitly rejected in Mazzei. Compare Satinwood, 385 F.3d at 173 (citing United States v. Anderson, 626 F.2d 1358, 1372 (8th Cir. 1980)), with Mazzei, 700 F.2d at 89-90 ("We are not persuaded by that precedent . . . .").

The difference between the distinct elements of RICO "enterprise" and "pattern of racketeering activity" was described by the Supreme Court in Turkette:

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose in engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.

452 U.S. at 583 (emphasis added). One element addresses group organization, while the other addresses conduct. The Mazzei decision essentially reiterated an observation the Turkette Court made that the "proof used to establish these separate elements may in particular cases coalesce." Id. That is to say, facts relating to the conduct of a group may in some cases suffice to prove by inference the organizational nature of the group itself. See Bagaric, 706 F.2d at 56 ("[I]t is logical to

characterize any associative group in terms of what it does, rather than by abstract analysis of its structure.").

Mazzei has not been overruled and remains good law in this circuit,[8] and the defendants' attempts to limit it as somehow outdated, or limited to the context of gambling or "non-commercial" cases is not persuasive.  This Court is bound to follow Mazzei until such time as an en banc panel of the Court of Appeals or the Supreme Court expressly or implicitly overrules it.  E.g., Anderson v. Recore, 317 F.3d 194, 201 (2d Cir. 2003).  Therefore, Techno has adequately pleaded both the existence of an enterprise and a pattern of racketeering activity even though the specific factual allegations supporting the existence of the enterprise also support the existence of the pattern of racketeering activity.

The Complaint alleges that "Reich, Jossem, Weiss, Weiss & Co. and others were members of a criminal enterprise . . . . The goal of the [enterprise] was to hide, conceal and launder in excess of one hundred million dollars stolen by Reich and Jossem in the early 1990s."  (Compl. ¶ 1.)  Weiss is alleged to have learned of the illegal acts of Reich and Jossem soon after they retained him and his accounting firm in 1993.  (Id. ¶ 51.)

---

[8]  Shortly before briefing on the current motions had been completed, the Court of Appeals for the Second Circuit cited Mazzei favorably in a decision relating primarily to the "pattern of racketeering activity" requirement of § 1962(c).  United States v. Daidone, 471 F.3d 371, 376 (2d Cir. 2006).

While no formal structure is alleged, apart from the aspects of
the scheme which Weiss himself devised and managed, the
enterprise that is alleged could constitute an "associat[ion] in
fact." 18 U.S.C. § 1961(4).  The Complaint includes extensive
detail about a variety of transactions ranging over a lengthy
period of time, all involving Weiss and Reich or Jossem, and all
allegedly designed to conceal and launder funds unlawfully.
This "course of conduct" suggests that Weiss and Weiss & Co. may
have functioned together with Reich, Jossem, and others as a
"continuing unit" with the "common purpose" of concealing and
laundering a large amount of funds.  Turkette, 452 U.S. at 583.
Judged by the liberal pleading standards of Rule 8, while Techno
will be required to prove the existence of the enterprise, the
Court cannot find that Techno could prove no set of facts that
would establish the existence of the enterprise.


### D.

The defendants next argue that Techno has evaded the
requirement that allegations of fraud be pleaded with
particularity pursuant to Rule 9(b) by simply choosing not to
label certain predicate acts as "fraudulent" even though the
conduct alleged sounded in fraud.  However, the predicate acts
that Techno has alleged as a basis for its RICO claim, which
include money laundering, transportation and receipt of stolen

28

property, and transactions greater than $10,000 in property derived from specific unlawful activity, do not include fraud as an element.  The Complaint also includes allegations of tax fraud and bankruptcy fraud committed by third parties, but the Complaint includes sufficient detail about these allegations of fraudulent acts by third parties to put the defendants on notice of the claims they face.

For all of the reasons explained above, the motion to dismiss the substantive RICO claim under § 1962(c) is denied.


**E.**

The defendants contend that the RICO conspiracy claim under § 1962(d) must be dismissed because it cannot stand without sufficient allegations of a substantive RICO violation and because the complaint does not allege an agreement between the defendants and other alleged participants in the conspiracy to commit predicate acts.  The first argument is unavailing because the Court has found sufficient allegations to support a substantive RICO claim pursuant to § 1962(c).  The second argument is also insufficient because Techno has pleaded a violation of § 1962(d) in the words of the statute and the Complaint includes extensive allegations describing how Weiss worked with Reich, Jossem, and others to conceal and launder funds through a variety of transactions, including allegations

that Weiss advised Reich and Jossem to employ certain money laundering schemes and shared an equity interest in at least one real estate project.

For these reasons, the motion to dismiss the RICO conspiracy claim under § 1962(d) is also denied.

**F.**

Because the Court has found that the defendants have failed to establish that the documents submitted with the Elsen Affidavit can support dismissal at this stage, there has been no prejudice to the plaintiff from the mere presence of these materials in the record.  Techno's motion to strike the Elsen Affidavit, its attached exhibits, and the defendants' factual assertions with respect to Techno's possession of those exhibits is therefore **denied as moot**.

**CONCLUSION**

For the reasons explained above, the defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(6) is **denied**.  The plaintiff's motion to strike matters outside the pleadings is **denied as moot**.

**SO ORDERED.**

**Dated:     New York, New York**
**           April 17, 2007**

                                    John G. Koeltl
                            United States District Judge

30